EVELYN GOTFREY, APPELLANT, V. SHIZUO SAKURADA ET AL., APPELLEES.

101 N. W. 2d 470

Filed March 4, 1960. No. 34735.

*Lawrence W. Rice*, for appellant.

*Wright, Simmons & Harris*, for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Evelyn Gotfrey, filed a petition in the Nebraska Workmen's Compensation Court against defendants, Shizuo Sakurada, Fred Ikeya, and Harry Hada, copartners, doing business as Eagle Cafe in Scottsbluff, seeking workmen's compensation for alleged injuries to her back caused by an accident arising out of and in the course of her employment by defendants on March 7, 1958. Defendants' answer denied generally, then admitted that plaintiff was so employed by defendants on March 7, 1958, but alleged that any disability presently suffered by plaintiff was not the result of anything that occurred in the course of her employment.

After a hearing before one judge of the compensation court, a judgment was rendered which dismissed plaintiff's action because plaintiff had not carried the burden of proof necessary to establish any right to an award of compensation. In that connection, it was found that there was no credible evidence, medical or otherwise, tending to prove that the symptoms and disability of which plaintiff complained resulted from the alleged accident on March 7, 1958. At a rehearing before the compensation court sitting en banc, such dismissal of plaintiff's action was affirmed. In that connection, it was found that the evidence was insufficient to prove with any degree of certainty that the symptoms and disability of which plaintiff complained resulted from an accident as alleged by her. Thereafter, plaintiff appealed to the district court for Scotts Bluff County, where, after hearing, a judgment was rendered which, for like reasons, affirmed the judgment rendered by the compensation court sitting en banc, and dismissed plaintiff's petition. Thereafter, plaintiff's motion for new trial was overruled, and she appealed, assigning in substance that the judgment was not supported by the evidence. We do not sustain the assignment.

In Jones v. Yankee Hill Brick Manuf. Co., 161 Neb. 404, 73 N. W. 2d 394, we reaffirmed that: "An appeal

to this court in a workmen's compensation case is considered and determined de novo upon the record.

"A compensable injury within the Workmen's Compensation Act is one caused by an accident arising out of and in the course of the employment.

"An accident within the Workmen's Compensation Act is an unexpected and unforeseen event happening suddenly and violently and producing at the time objective symptoms of injury.

"In order to recover, the burden of proof is upon the claimant in a compensation case to establish by a preponderance of the evidence that personal injury was sustained by the employee by an accident arising out of and in the course of his employment.

"An award of compensation under the Workmen's Compensation Act may not be based on possibilities, probabilities, or speculative evidence.

"The rule of liberal construction of the Workmen's Compensation Act applies to the law, not to the evidence offered to support a claim by virtue of the law. The rule does not dispense with the necessity that claimant shall prove his right to compensation within the rules above set forth nor does it permit a court to award compensation where the requisite proof is lacking." See, also, Feagins v. Carver, 162 Neb. 116, 75 N. W. 2d 379; Shanhols v. Scottsbluff Bean & Elevator Co., 168 Neb. 626, 97 N. W. 2d 220.

In the light of such rules, we have examined the record, which, as summarized, discloses the following: On the evening of March 7, 1958, plaintiff was employed by defendants as a pantry girl in defendants' restaurant. Plaintiff's husband had divorced her on December 26, 1957, but she was still going with him before and at the time of this trial. Plaintiff worked 7 days a week, and her salary averaged $35 a week. She testified that about 9 p. m., as she started to go down into the basement over an open stairway to get some supplies, she slipped and fell on the top step

and "hit on the lower part of my back and on my shoulder" then she slid down the stairs three or four steps. Later, she testified "I, also, hit my head" and that "I finished work that night" but had a headache and "I didn't feel good all night long." She had no other pain at that time. She went to work the next day and worked off and on for a few days. Thereafter, she claimed that she began to have backaches, so on March 10, 1958, she consulted with her physician with whom she had previously consulted on February 22, November 21, and November 22, 1957. She did not call such physician as a witness in her behalf, and although she had also consulted with other physicians, she did not call some of them as witnesses. Her physician was called as a witness by defendants. Plaintiff's purpose in consulting with him was to determine whether or not she was pregnant. She testified that at that time she told her physician about her fall and back pain. However, her physician testified that on March 10, 1958, plaintiff said nothing about a fall and made no complaint of back pain. His written records made at that time verify his testimony. He testified that a thorough examination was made on March 10, 1958, showing no abnormalities except tenderness to pressure of the ligaments that go to the uterus and a small amount of blood found in the cervical os. Her condition was diagnosed as "possible pregnancy, threatened abortion." He gave her a prescription and she was "sent home to get off her feet." After plaintiff had called him while at work, he examined her again in a hospital on March 13, 1958, at which time she first told him about the fall. That examination revealed a somewhat enlarged uterus, a slightly dilated cervix, and a small amount of material fragments which were removed from the uterus for examination by the pathologist, who reported his diagnosis as "Acute suppurative endometritis" which is an inflammation of the uterus. His report said in part: "From the areas of exudation and necrosis one wonders

whether there has not been some previous instrumentation in this patient, but the appearance of the endometrium would not suggest that implantation has recently occurred." With regard thereto, plaintiff's physician testified that plaintiff was not pregnant when he examined her in the hospital, but " 'Whether she was or was not pregnant prior to her visit to my office, I do not know, but suspicion that some instrumentation had been done prior to this time, and fear probably prompted her to seek medical attention.' " He also testified that he could find no evidence of back trouble or injury to her back as a result of the fall on March 7, 1958; that he "couldn't state that she had any disability"; and that the condition found in her uterus could not have resulted from a fall.

Plaintiff left the hospital March 15, 1958, and went back to work for defendants about March 23, 1958, although she claims that she did not feel good in her back and felt tired and weak. Thereafter, she worked almost steadily until July 20, 1958, but claimed that her back condition got worse and she had pain in her back while working, so she quit and has performed no remunerative work since.

Another physician who examined plaintiff at her counsel's request on October 15, 1959, was called as a witness by plaintiff. He gave her a thorough examination and detailed the extent thereof in his testimony. The substance of his testimony was that his examination showed plaintiff to be a normal, healthy person. After comparing his own X-rays with X-rays taken by another physician on February 16, 1959, he testified: "I can't see very much wrong anyplace," and that: "There are no physical findings at present to substantiate a claim of injury as a result of the fall * * *. All her symptoms are subjective * * *." In commenting upon an X-ray report of a radiologist, he said: "Well, I agree with it because he says it is perfectly normal." He thought that some inflammation might exist around

plaintiff's lumbosacral joint, but that everything else was essentially normal.

Another physician called as a witness by plaintiff examined her on February 16, 1959. In her history, she told him about a fall on March 7, 1958, while employed by defendants; that she had no severe pain at the time; and that she finished work that day. She related her hospital experience and that she was off work because of back pain which was aggravated by heavy lifting. Such physician's examination disclosed: "* * * a well developed, well nourished white female in no apparent pain or distress"; and that "she walks erect, no stoop or limp * * * she stands erect; she has a minimal anterior-posterior lumbar sacral curve, less than you would normally see." Her extremities disclosed nothing significant, and "Straight leg raising was 80 degrees bilaterally"; that "There was no parethesia or anesthesia"; and that "there was some adnexa tenderness," but "no masses." Such tenderness could be accounted for by a threatened or incomplete abortion about a year before. He found some "tenderness along both sacro-iliac joints" and his "impression at that time was" that she had a "functional low backache," which had no "organic basis." Thereupon he sent her to a hospital for X-rays, but he "did not find any definite organic disease" or "organic basis" for the back pain about which plaintiff complained. He found no "evidence of nerve root irritation," and he "did not find any evidence indicating * * * that her present complaints are the result of that alleged accident" on March 7, 1958.

At the request of plaintiff's counsel, an orthopedic surgeon in Cheyenne, Wyoming, examined plaintiff on March 9, 1959. Pursuant to a stipulation, his testimony with regard to plaintiff's condition was contained in a letter addressed to plaintiff's counsel as of March 20, 1959. The history given to him by plaintiff was as follows: "She advised me that she had injured her back in March of 1958 when she slipped and fell down

stairs. Her feet flew out from under her and she fell, striking her back against the edge of some steps. She experienced immediate onset of back pain which has been present since. The pain is constant; however, it is more severe on occasions. The patient continued to work until July of 1958. At that time she was forced to quit because of back pain. She became progressively worse. She localized the pain to the low back area and stated that it involved both hips and passed into both legs. The left leg was more involved than the right. The pain passed to the level of the calf, in both legs. Coughing and sneezing do not aggravate her pain, nor do changes in the weather. Leg pain appeared within the past three or four months. Lying down apparently relieves the discomfort on occasion. Occasionally she is forced to walk with a limp. She advised me that she has a tingling sensation in the legs and occasionally the aching nature of the pain is broken by episodes of sharp pain in the mid back as if something slips. She has experienced no previous back trouble. Her past history reveals that she has undergone no surgery. She has had no serious illnesses. She has been married and is divorced."

Such physician reported that on physical examination, plaintiff "localized her pain to the lumbo-sacral area of the back" and "She was extremely tender" over that area "on palpation and percussion." He found that "There was a pelvic tilt to the right. The left shoulder was higher than the right shoulder." He further found that "The range of motion present in the back was limited slightly to the terminal ranges of motion." A copy of the report of his X-rays taken March 9, 1959, recited that " 'The hips are unremarkable. The pelvis proper shows no abnormality. The sacroiliac joints appear normal * * *. Other than slight narrowing of the joint space at the L5 S1 level, no abnormality is seen in the lumbar spine.' "

It was his opinion that plaintiff was "suffering from

mild lumbo-sacral disc disease which could have occurred from the alleged injury *and on the basis of the history she presents, did.*" (Italics supplied.) It was further his opinion that "her present condition is mild and of a non-surgical nature" but "There may be some psychosomatic element to this problem" and he felt that she did have "a temporary partial disability which can be fixed at the present time at 10% of the body as a whole."

In that connection, it will be noted that his report does not disclose that he was ever advised of plaintiff's history of suspected pregnancy and possible abortion.

As we view it, the opinion of such orthopedist with regard to the cause of plaintiff's disability, if any, is based primarily upon the history given to him by plaintiff. However, such history is certainly magnified and concealed as well in material respects to fit the occasion, and is contrary to plaintiff's own testimony and the testimony of her physicians heretofore recited. Such orthopedist evidently based his opinion primarily upon plaintiff's recited fact that there was an immediate presence of pain in her back on the night of the fall which has persisted ever since, and other statements made by plaintiff which are simply not supported by the facts. Without in any manner criticizing the able orthopedist, we point out that he was simply misled by plaintiff and was thereby mistaken.

In that connection, we have held that: "The value of the opinion of an expert witness is dependent on, and is no stronger than, the facts on which it is predicated. The opinion has no probative force unless the premises upon which it is based are shown to be true." Hamilton v. Huebner, 146 Neb. 320, 19 N. W. 2d 552, 163 A. L. R. 1. See. also, Williams v. Watson Bros. Transp. Co., 145 Neb. 466, 16 N. W. 2d 199. Such rule is applicable and controlling herein with reference to the orthopedist's testimony.

A chiropractor who practiced in Scottsbluff, was called as a witness for plaintiff. He testified that his duties were "primarily to relieve nerve impingements, primarily of the spine." He first saw plaintiff on July 11, 1958, when she gave him a history of having fallen down some stairs at defendants' cafe several months previously when she hurt her lower back; that a few days later, she was admitted to a hospital for a miscarriage; and that she had worked part of the time and needed something to relieve the pain in her lower back on the right side and around in front. The chiropractor testified that he found some tenderness in plaintiff's lower back around the fifth lumbar portion, so on the third visit he took X-rays of plaintiff's back, one of which showed the "right ilium is slightly lower than the left" and a slight curvature of the spine, but he could not say what caused it. Another X-ray showed "a normal lumbar" but the "Sacral angle is a little more pronounced" which plaintiff may have had "at the time of injury or since that injury. That I don't know." He also found an abnormal "anglation up above the lumbar vertebrae" which he could not say was caused by an injury. However, he thought that you couldn't tell whether or not the condition shown in the X-rays would cause disability to perform any work or labor. He testified that he had no way of knowing whether the conditions he found were caused by any accident in recent months or theretofore; and that the condition shown by the X-rays was not such that he could say whether it was a natural condition or was caused by accident or something else. He found a congenital abnormality of the lumbar vertebrae which was of no significance. The last time he saw plaintiff was on July 23, 1958, and he testified that the condition in which he found plaintiff at the times he treated her was one that might be caused by something other than her fall in March 1958.

In the light of the evidence heretofore set forth, and rules of law heretofore cited, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs are taxed to plaintiff.

AFFIRMED.