A. Lowell Johnson, Administrator de bonis non with will annexed of the Estate of Edwin Yoder, deceased, appellant, v. Florence L. Munsell et al., appellees, Impleaded with Alta Yoder, individually, and Mark A. Buchholz, guardian of Alta Yoder, appellees.

104 N. W. 2d 314

Filed July 15, 1960. No. 34777.

*Barney, Carter & Buchholz,* for appellant.

*Sterling F. Mutz,* for appellees Munsell et al.

*Mark A. Buchholz,* for appellees Yoder et al.

Heard before MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, A. Lowell Johnson, as administrator de bonis non with the will annexed of the estate of Edwin Yoder, deceased, filed this action on June 21, 1958, against defendants, Florence L. Munsell, Lydiellen Hagen, Aldine Lindeman, and Don W. Munsell, allegedly doing business in the partnership name of Munsell's Mineral Products Company, and said company, a copartnership. Upon motion of defendants and after hearing thereon, Alta Yoder, the incompetent surviving wife of Edwin Yoder, deceased, and Mark A. Buchholz, her duly appointed, qualified, and acting guardian, were made parties defendant, and upon application of defendants in open court said guardian was appointed guardian ad litem for Alta Yoder.

Hereafter, A. Lowell Johnson will be called plaintiff; Munsell's Mineral Products Company will be called the company; Florence L. Munsell will be called Mrs. Munsell; Lydiellen Hagen will be called Mrs. Hagen; Aldine Lindeman will be called Mrs. Lindeman; and Don W. Munsell will be called Don. All such individually-named defendants were children of Mrs. Munsell and all were surviving partners in defendant company except Mrs. Hagen when Edwin Yoder, one of the partners, died on November 6, 1953. When referring to all such surviving partners and the company, they will be called defendants. Edwin Yoder, deceased, will be called Mr. Yoder; Alta Yoder will be called Mrs. Yoder; and Mark A. Buchholz, guardian and guardian ad litem, will be designated as such.

The purpose of plaintiff's action was to obtain an accounting against the alleged surviving partners and the company in order to obtain a determination of the value of Mr. Yoder's interest in the company, including his alleged share of good will of the business at the time of his death; and to recover same, together with profits of the company from November 6, 1953, up to the time the amounts found due plaintiff are paid in lieu of interest on Mr. Yoder's alleged capital contribution to the company during said time.

Plaintiff's petition alleged that on October 1, 1937, Mr. Yoder, Mrs. Munsell, Mrs. Hagen, Mrs. Lindeman, and Don duly entered into a written partnership agreement and became partners in defendant company, after which time they engaged in the business of selling mineral products in the name of the company. A copy of such agreement was attached to and made a part of plaintiff's petition. His petition alleged that said company commenced doing business under that agreement on or about October 1, 1937; that the partnership continued to do so up until November 6, 1953, the date of Mr. Yoder's death; and that defendant surviving partners have continued their partnership business since

November 6, 1953. Plaintiff's petition also alleged, as shown by the agreement, that on October 1, 1937, Mrs. Munsell's interest in the partnership was 46.09 percent; Mr. Yoder's interest was 17.26 percent; Mrs. Hagen's interest was 12.22 percent; Mrs. Lindeman's interest was 12.21 percent; and that Don's interest was 12.22 percent. However, plaintiff's theory of recovery was that on June 24, 1946, Mrs. Munsell assigned 7.74 percent of her interest in the partnership to Mr. Yoder, leaving Mrs. Munsell with a 38.35 percent interest and Mr. Yoder with a 25 percent interest; that on March 30, 1953, Mrs. Hagen assigned her 12.22 percent interest to Mrs. Munsell, leaving her with a 50.57 percent interest; and that such assignments as a matter of law dissolved the partnership and freed the remaining partners from the obligations of the October 1, 1937, partnership agreement; that in the absence of any new agreement, either oral or written thereafter, all rights and duties must be determined under the provisions of the Uniform Partnership Act; that when Mr. Yoder died on November 6, 1953, the then existing partnership became dissolved under section 67-329, R. R. S. 1943; and that as a matter of law under the circumstances heretofore recited and the provisions of section 67-342, R. R. S. 1943, plaintiff was entitled to an accounting and the recovery sought herein.

In that connection, it is well to point out here that the written and witnessed assignment of 7.74 percent interest by Mrs. Munsell to Mr. Yoder on June 24, 1946, is attached to and made a part of plaintiff's petition. Therein it recites that it was understood and agreed that all terms and conditions of the October 1, 1937, partnership agreement should remain in full force and effect except as to the change of percentage of ownership occasioned by such assignment. Also, without dispute and with Mr. Yoder's consent and agreement, the partnership so continued to operate thereafter under the partnership agreement until Mr. Yoder's death.

Further, on June 12, 1953, after Mrs. Munsell had received an assignment from Mrs. Hagen of her 12.22 percent interest on March 30, 1953, Mrs. Munsell, by written and witnessed assignment, transferred 12½ percent of her interest to Mr. Yoder for life, with remainder to Mrs. Munsell after Mr. Yoder's death. That assignment also admittedly recited that it was understood and agreed that all terms and conditions of the October 1, 1937, partnership agreement should remain in full force and effect except as to the change of percentage of ownership occasioned by such assignment. Also, without dispute and with Mr. Yoder's consent and agreement, the partnership so continued to operate thereafter under the partnership agreement until Mr. Yoder's death.

As far as important here, the October 1, 1937, partnership agreement, duly executed and acknowledged, provided in substance as follows: The name under which the partnership business was to be conducted was Munsell's Mineral Products Company, and it was to continue for an indefinite period. The partnership had power and authority to engage in the buying, selling, and dealing in minerals and allied products. It was agreed that they and each of the partners would be entitled to the net profits and be obligated to pay net losses in operation of the business of the company in the proportion their investments bear to the total investments of all the partners and that *"said proportions may be changed from time to time as the percentage of investment of each partner increases or decreases as herein agreed upon."* (Italics supplied.) The then agreed percentages of ownership by each of the five partners were stated as heretofore set forth.

It was agreed that control of the partnership should be vested at all times in those partners owning a majority of the investment in the company, provided, however, that management of the business might be entrusted to such person or persons as might be selected from time to time by those partners owning a

majority of the investment. Officers of the company were agreed to be a president, secretary, and treasurer, selected from among the partners, any two of which offices might be held by one person, and that such officers should perform the duties and have authority usually and customarily incident to those offices in partnership companies, but they should have such authority and perform such other duties as the partnership might from time to time determine. The partnership was given power and authority to select and employ a general manager who might or might not be one of the partners, and vacancies were to be filled by the same method as of elections of officers thereto for unexpired terms, but any officer or general manager might be removed by the vote of those partners owning a majority of the investment. Officers were required to be elected for 1 year and hold office until their successors were duly elected and qualified. Annual meetings of the partners were agreed to be held on the first Tuesday in February each year and any partner might vote by proxy. For the purpose of circumscribing and limiting the power of individual partners, it was agreed that no one or more partner had power or authority except by specific authority spread upon the minutes of the partnership and approved by the partners owning a majority in amount of the investment to do or perform any acts, among which was: "(d) To change or alter any written agreement of the partnership." Each of the parties agreed that he would not under any circumstances nor at any time state or represent that he was the owner of a greater share in the partnership than he actually had, or that the partnership had power or authority beyond that expressed in the partnership agreement, or that he or she as a partner had power and authority which had not been expressly conferred on them, or otherwise make any false representations concerning the power and authority of the partnership or the individual partners therein. It was agreed that

regular meetings of the partners could be held at such times as should be determined from time to time by the partners, and such meetings could be called at any time upon 7 days' notice mailed to each partner, or when ordered by the president and secretary.

It was agreed that distribution of the profits should be made at such times and in such amounts as should be determined from time to time by the partnership, and that same should be subject to control of a majority in amount of investment. Losses were agreed to be pro-rated among the partners according to the pro rata proportion of the investment and assessments made for any purpose should be based pro rata in proportion to the amount of the investment, and upon failure to pay same by any partner the partnership was given a lien for the amount thereof upon the share of such partner.

It was specifically agreed that upon death of any one of the partners, the business of the partnership would be technically dissolved and the surviving partners would be considered as trustees to carry out the partnership agreement and *"the surviving partners shall continue to operate the business as trustees upon the same terms and conditions as specified herein except for the absence of the deceased partner"* and that the business would be disposed of as follows: Within 10 days after the death of a partner, the surviving partners should call a special meeting and determine the market value of the deceased partner's share in the partnership and the survivors should have first option to purchase such share pro rata according to the respective shares on the basis of such appraised value, provided that those succeeding to the ownership of the deceased partner's share would be willing to sell such share upon the basis of such appraised value. (Italics supplied.) It was provided, however, that if those who succeeded to the share of the deceased partner should not elect to sell it at such appraised value, then within a reasonable time its value should be determined by the surviving part-

ners and the representative of the owner of the deceased partner's share, each selecting an appraiser and the two appraisers selecting a third, with survivors having an option to purchase said share by paying the amount of such appraisal. If the surviving partners should elect then not to purchase such share of the deceased, it was agreed that those who became owners thereof might be substituted as owner, subject to the limitations and conditions of the partnership agreement.

With regard to the matter of the appraisal by approved appraisers, we may assume that an unexecuted agreement to arbitrate will not ordinarily be recognized by the courts of this state because the effect thereof would be to oust the courts of their legitimate jurisdiction. See Phoenix Ins. Co. v. Zlotky, 66 Neb. 584, 92 N. W. 736. However that may be, such assumption will not avoid enforcement by courts of the valid provisions of the partnership agreement or affect the result under the circumstances presented herein.

In that connection, it was agreed in the partnership agreement that it should be binding on the parties thereto and their heirs, executors, administrators, personal representatives, devisees, legatees, next of kin, and upon all persons who succeeded to any right, title, or interest in or to the share of any of said partners, and should be binding upon successors in interest, guardians, and other persons, firms, or. corporations succeeding to any right, title, or interest of any of the partners or the partnership, as provided in said agreement.

The guardian of Mrs. Yoder filed an answer claiming for her such interest in the premises as she was entitled to have; submitting her rights and interest to protection of the court; and praying for recovery of costs. Said guardian also filed a separate answer as guardian ad litem for Mrs. Yoder wherein he alleged that the action was for her ultimate benefit; claimed such interest in the premises for her as she was entitled to have; and prayed for recovery of costs. He also attended the

trial as guardian and as guardian ad litem, and was allowed $100 for services as guardian ad litem, which was taxed as costs to plaintiff. The other defendants filed an answer wherein they admitted that the parties had entered into a partnership agreement on or about October 1, 1937, as alleged by plaintiff; that Mr. Yoder and defendants, except Mrs. Hagen, continued to operate the business under said agreement until Mr. Yoder's death on November 6, 1953; and that Mrs. Hagen was not a partner on that date, she having assigned all of her right, title, and interest in the partnership to Mrs. Munsell on March 30, 1953. Mrs. Hagen prayed for dismissal of the action as to her at plaintiff's cost. The theory of defense for other surviving partners and the company was that after Mr. Yoder's death they allegedly continued to operate the business as provided in the partnership agreement; that within 10 days after November 6, 1953, the surviving partners called a special meeting and determined the market value of Mr. Yoder's interest to be $5,497.91 on November 6, 1953; that immediately on notice to Mrs. Yoder they exercised their option to purchase Mr. Yoder's share on the basis of such appraisal and offered to pay same to the legal representative of Mr. Yoder when appointed; that on or about March 22, 1954, Alta Yoder was appointed and qualified as executrix of the estate of Edwin Yoder, deceased; that after she was so appointed, and prior to March 31, 1954, she refused to sell Mr. Yoder's share for said appraised value and so notified defendants; that thereupon defendants demanded of Mrs. Yoder individually and as executrix to comply with the provisions of the partnership agreement and make selection of an appraiser, defendants having so selected one to determine the value of Mr. Yoder's share in the partnership so that surviving partners might exercise their option to purchase such share, but she refused to comply and notified defendants that as successor in interest and as executrix she would not be bound by any terms and

conditions of the partnership agreement; that thereafter, on or about April 15, 1954, defendants made a full, accurate, and complete accounting of all assets of every kind and character of the partnership; that same was then delivered to Mrs. Yoder as executrix by defendants who again offered to pay and tendered to her $5,497.91 for the share of Mr. Yoder, deceased; but she refused to accept same or be bound in any manner by the partnership agreement; that defendants kept the tender of such sum good; and that on or about February 23, 1956, defendants delivered such tender to the county judge of Lancaster County to be held by him for the use and benefit of Mrs. Yoder as successor and legal representative of the estate of Edwin Yoder, deceased, which sum was later withdrawn by said representative without prejudice to any rights to recover more. Defendants alleged that by reason of the circumstances aforesaid, the 4-year statute of limitations began to run on March 31, 1954, and that plaintiff's cause of action was barred thereby.

With regard to the statute of limitations, it is well to point out here that admittedly in June 1954, defendants paid to the estate $1,415.49 as profits for 1953; that in January 1955, defendants paid to the estate $1,410.75 as profits for 1954; and that in February 1956, defendants paid to the estate $665.90 as profits for 1955. Thus, we do not deem it necessary to further discuss the statute of limitations except to say that we do not believe that it has barred plaintiff's action.

Defendants also alleged that they had fully and completely paid to the representative of Mr. Yoder's estate and to Mrs. Yoder as successor thereto, all of the right, title, and interest in and to defendant company which was due and owing thereon, and that because a complete accounting had already been had as requested by Mrs. Yoder as executrix and by plaintiff herein as administrator, plaintiff was not entitled to have an accounting and recover any additional sums. Defendants' prayer

was for judgment in favor of defendants and recovery of costs.

After a pretrial conference and an order thereon, a trial was had to the court whereat evidence was adduced by the parties and a judgment was rendered which found and adjudged the issues generally in favor of defendants and against plaintiff, with costs taxed to plaintiff, including an allowance of $100 for services of the guardian ad litem for Alta Yoder.

In that connection, the judgment found and adjudged that neither the sale by Mrs. Hagen of her interest in the partnership to Mrs. Munsell nor the death of Mr. Yoder nullified or destroyed the legal effect of the written partnership agreement as to the right of the surviving partners to continue the partnership business after Mrs. Hagen's withdrawal and after the death of Mr. Yoder, or as to their right to wind up partnership affairs according to the terms of said partnership agreement; that defendants have fully complied with the terms and conditions of said partnership in the manner and form as claimed by defendants; that as surviving partners they made a full, accurate, and complete accounting of the assets of the partnership as of November 6, 1953, the date of the death of Mr. Yoder; that they tendered to plaintiff through the county court the sum of $5,497.91, which sum had been determined by the surviving partners to be the amount of Mr. Yoder's share in the partnership on the date of his death; that same was paid to the estate without prejudice to any rights plaintiff might have to recover more; that thereafter plaintiff claimed that the estate was entitled to recover an additional amount for good will of the business, but that the evidence presented was insufficient to show that plaintiff was entitled to recover any sum whatever for his claim to good will; that the books, records, and accounts of defendant company were opened to an accounting by representatives of plaintiff, including a certified public accountant; that defendants have fully

complied with and supplied plaintiff with all the information requested or demanded by plaintiff in connection therewith; and that the evidence shows that the findings of defendants were true, accurate, and correct as to the amount of the assets of the partnership coming to the estate of Edwin Yoder, deceased.

Plaintiff's motions for new trial were overruled and he appealed, assigning in substance: (1) That the findings and decision were contrary to the law and evidence; (2) that the court erred in finding that the evidence was insufficient to show that plaintiff was entitled to recover any sum for good will; and (3) that the court erred in taxing as costs to plaintiff the fee of $100 for services of the guardian ad litem. We sustain the last assignment and dispose of it first.

In that connection, it is admitted that on March 22, 1954, letters testamentary were issued by the county court to Alta Yoder, widow of Edwin Yoder, as executrix of his estate. She admittedly served until September 11, 1956, when she became mentally incompetent, and Mark A. Buchholz was appointed and qualified as her guardian. On April 10, 1957, Mrs. Yoder was discharged as executrix and plaintiff herein was appointed and qualified as administrator de bonis non of the estate of Edwin Yoder, deceased, and has acted in that capacity ever since. He has not refused to bring this action but has done so in such capacity, and no charge is made that he was guilty of fraud, misrepresentation, or dereliction as such. Section 30-301, R. R. S. 1943, provides: "The word 'executor,' as used herein, shall be construed to include an administrator with the will annexed."

This court held in Prusa v. Everett, on rehearing, 78 Neb. 251, 113 N. W. 571: "The term 'administrator de bonis non,' used in reference to the administration of estates by the courts of this state, means an administrator who has been appointed in the place of a former ad-

ministrator or executor who has ceased to be such after partial administration of the estate.

"The administrator de bonis non has all the powers of his predecessor, and may sue to recover funds in the hands of agents employed by his predecessor."

In Minahan v. Waldo, 161 Neb. 78, 71 N. W. 2d 723, we held that: "The representative of an estate is authorized to and should prosecute an action if he in good faith believes it is necessary for the recovery of a debt owing the estate." See, also, § 30-803, R. R. S. 1943. Also, section 38-502, R. R. S. 1943, authorized the guardian of Mrs. Yoder to sue for and appear for her in legal suits and proceedings unless where another person is appointed for that purpose as a guardian or next friend.

Section 25-317, R. R. S. 1943, provides that: "Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the question involved therein."

Neither Mrs. Yoder's guardian nor her guardian ad litem had or claimed any interest adverse to plaintiff, but rather as defendants joined with plaintiff seeking like relief. Alta Yoder was not a necessary party to a complete determination or settlement of the questions involved, and she required no appointment of a guardian ad litem. We may assume, for argument only, that plaintiff and the guardian were united in interest within the provisions of section 25-318, R. R. S. 1943. In that connection, plaintiff had power and authority to represent the estate of Edwin Yoder, deceased, of which Mrs. Yoder, incompetent, was sole beneficiary, and her guardian likewise had power and authority to sue for and appear for her in legal suits and proceedings. There being no necessity for the appointment of a guardian ad litem, and since defendants requested such appointment, and services as guardian ad litem were performed as requested, the $100 fee allowed by the court for such

services should have been and hereby is ordered taxed as costs to defendants.

We have consistently held that: "Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Wiskocil v. Kliment, 155 Neb. 103, 50 N. W. 2d 786.

In the light thereof and other rules hereinafter mentioned, we have examined the evidence. The business of defendants, Munsell's Mineral Products Company, was originally organized and established in June 1920 by the husband of Mrs. Munsell and father of other originally named defendants, but the company was not then a partnership. The husband and father died June 8, 1928, and the company has continued operations since that time. Mr. Yoder, who was totally blind at all times, became associated with defendant company as an employee in 1925. He started as a stenographer and at times took care of affairs of the company while others interested therein were absent from the company office. When Mr. Munsell died, he left Mr. Yoder 10 shares in the company, and Mr. Yoder thereafter acquired a few more by gift or payment of little consideration therefor. The nature of the company's business was purchasing at wholesale and repacking, advertising, distributing, and selling food tablet supplements consisting of minerals and vitamins to retail dealers. The company had no sales agents as such, but distributed and sold such products to independent dealers who sold at retail in 8 or 10 states. The company's principal place of business was always in Lincoln, Nebraska. On October 1, 1937, defendants and Edwin Yoder entered into the partnership agreement heretofore set forth, and the business was carried on thereunder by them with

Mr. Yoder holding a 17.26 percent interest in the partnership until June 24, 1946, when Mrs. Munsell assigned a 7.74 percent interest to him, thus giving him a 25 percent interest, which was done by a witnessed agreement in writing that the October 1, 1937, partnership agreement should remain in full force and effect except as to such change of percentage of ownership. Thus, the business was carried on until March 30, 1953, when Mrs. Hagen assigned her 12.22 percent interest in the partnership as a gift to her mother, Mrs. Munsell, who on June 12, 1953, as importuned by Edwin Yoder, assigned 12½ percent of her interest in the partnership to Mr. Yoder for life, with the remainder to Mrs. Munsell, which was done by a witnessed agreement in writing that the October 1, 1937, partnership agreement should remain in full force and effect except as to such change of percentage of ownership, and the business then continued to so operate with Mr. Yoder's acquiescence, consent, and profit until his death on November 6, 1953.

Contrary to plaintiff's contention, such assignments did not under the circumstances presented herein ipso facto dissolve the partnership and free the partners from the terms and conditions of the partnership agreement. As stated in 68 C. J. S., Partnership, § 346, p. 852: "A sale, conveyance, transfer, or assignment by a partner of his interest in the partnership or in the partnership property to a copartner * * * does not of itself dissolve the partnership, although the entire circumstances connected with such a transfer may be sufficient to bring about its dissolution. * * * a partner's conveyance of his interest in the partnership property to a copartner operates as a dissolution of the partnership only when it is clear that the parties contemplated and intended the entire withdrawal from the partnership of such partner and the termination of the partnership as between themselves." In other words, the effect to be given such conveyance by one partner to another partner is primarily a question of intention or agree-

ment by the parties herein, made clear in the manner heretofore set forth in both the original partnership agreement and in the written assignments. See, also, 40 Am. Jur., Partnership, § 244, p. 299, and authorities cited.

Prior to the death of Edwin Yoder and thereafter, Mrs. Munsell was the president and head of defendant company, and had received a salary as such. Mr. Yoder had also received a salary for his services as secretary or office manager and stenographer but no other partners were paid any salary before the death of Mr. Yoder because they did not actively participate in the business. In 1954 and thereafter, Mrs. Munsell was paid a salary as was Mrs. Lindeman because she performed the services theretofore performed by Mr. Yoder, and Don, a physician, was paid a salary of $50 a month in 1956 for serving as a medical and business advisor. After November 6, 1953, the business continued in conformity with the partnership agreement, and such salaries were fixed by the surviving partners who owned a majority of the investment.

On October 31, 1953, before Mr. Yoder's death, the partners made a full and complete statement and accounting of the assets of defendant company. Following Mr. Yoder's death and funeral, the surviving partners met in conformity with the partnership agreement and admittedly again made a full, complete, and correct accounting of the assets of the company and determined that Mr. Yoder's percentage share had a market value of $5,497.91. However, such amount did not include anything for good will because the company's books and records never carried it as an asset and it had never been considered or treated as an asset in any purchase of shares or transactions between the partners or otherwise. It is admitted that $5,497.91 was the correct value of Mr. Yoder's interest if plaintiff was not entitled to recover anything for good will. Complete records had always been kept of each partner's percentage of ownership,

based on book value, together with profits paid based thereon, and the salaries paid and received by them, if any, were reported regularly to each partner. Income tax returns also reported each partner's interest in the company, the profits paid to them, and salaries if any received by them.

Right after the surviving partners had valued the assets and receipts of the company and had determined the value of Mr. Yoder's interest therein on November 6, 1953, a statement thereof was given to Mrs. Yoder who made no objections at that time. Within 10 days after November 6, 1953, the surviving partners invited Mrs. Yoder and her then attorney to a meeting with them and such meeting was held whereat they were presented a statement of the company's assets and liabilities and the determination of the value of Mr. Yoder's interest. In the meantime, before Mrs. Yoder had been appointed executrix on March 22, 1954, several conferences were held with her concerning Mr. Yoder's interest in the company and the partnership agreement, and Mrs. Yoder was asked to cooperate but she was hostile to the partnership agreement and refused to recognize it. Soon after she was appointed executrix, she refused to accept defendants' tender of $5,497.91 for Mr. Yoder's interest and the surviving partners' offer to purchase his interest for that amount, but she demanded payment for good will. She also refused upon request to appoint an appraiser of such interest. Thereafter the company continued to operate the business as provided in the partnership agreement and the tender of such sum was kept good by defendants.

Admittedly, in June 1954, Edwin Yoder's estate was paid $1,415.49 by defendants as profits for 1953; in January 1955, it was so paid $1,410.75 as profits for 1954; and in February 1956, it was so paid $665.90 as profits for 1955, which made a total of $3,492.14 so paid to the estate. On February 23, 1956, defendants filed an application for an order in the estate proceedings of Edwin

Yoder's estate. Therein pertinent facts heretofore set forth were recited, and a financial statement as of November 6, 1953, and to date was attached, showing the previous determination of Mr. Yoder's interest by the surviving partners and payment of profits as heretofore recited. A bank draft for $5,497.91 was also then tendered, payable to Alta Yoder, executrix. The prayer of such application was for an order requiring Alta Yoder, executrix, to accept such sum for Mr. Yoder's interest in the company so that defendants might be released of all claims and liabilities arising between the partnership and the representative of Edwin Yoder, deceased. The total amount thus paid to the estate was shown to be $8,990.05.

Thereafter, on March 28, 1956, defendants filed an amended application for an order in the estate of Edwin Yoder, deceased. Therein it was shown that Alta Yoder, as executrix, was willing to accept and receipt for $6,163.81, without prejudice, which sum in fact included the $5,497.91 interest of Mr. Yoder and profits of $665.90 paid to the estate in February 1956, which still remained in said estate. Defendants' application indicated that they were willing for her to accept and receipt for such sum without prejudice to any right she might have to sue to recover any additional amount she claimed to be due. Accordingly, defendants' amended application prayed that the $6,163.81 be paid over to Alta Yoder as executrix with instructions that receipt thereof by her would be without prejudice as aforesaid, and that upon such payment an order be entered permitting defendants to withdraw their original application. That was done, and on April 18, 1956, defendants filed a dismissal of their original application reciting again that it was done without prejudice to any proceedings which Alta Yoder, executrix, might decide to file if she claimed additional money due. She did not ever file any such proceedings although she served as executrix until September 11, 1956, when she was

found incompetent and her guardian was appointed. Thereafter, on April 10, 1957, she was discharged as executrix and plaintiff was appointed and qualified as administrator de bonis non of the estate of Edwin Yoder, deceased, and on June 21, 1958, such administrator brought this action.

The books and records of the company were always made available to Mrs. Yoder individually and as executrix, and to her certified public accountant. He made an original accounting of the company's assets prior to December 29, 1953, but after Mr. Yoder's death, and found that the books and records had been kept correctly and in a true and accurate manner, and that the amount determined and set apart to pay the representatives of Edwin Yoder for his interest was correct except for good will, if any. After plaintiff's appointment and at request of his attorney another certified public accountant who had been previously associated with the accountant who had examined defendants' records and reported thereon prior to December 29, 1953, examined briefly defendants' books and records, including all income tax returns of the company appearing as evidence in this record and figures obtained by him through the first accounting aforesaid. Plaintiff's accountant did not at any time make a technical audit of defendants' books or trace any items to their source. He testified as an expert witness for plaintiff that defendants' income tax returns correctly reflected records of the company; that the company's books and records were correct and complete in accord with standard accounting practices, with one exception unimportant here; that defendants cooperated fully and made all their records available to him; that $5,497.91 correctly reflected Mr. Yoder's interest in the company on November 6, 1953, except for good will, which was not reflected in the books and records; and that such would not ordinarily be done unless there was good will and it had been purchased as such, which in fact had never been done by any of

the parties. Such witness defined good will as the ability of a business to continue to earn a normal rate of return on assets invested in the business. Based upon a hypothetical theory and some assumptions, he testified that defendants' business had a good will value and that the value thereof was $12,000 which it appears was more than one-half the admitted book value of the company's assets on November 6, 1953. In that situation, Edwin Yoder's estate would be entitled to 25 percent or $3,000, which it appears was more than one-half the admitted book value of Edwin Yoder's interest in the company on November 6, 1953. In fixing such amounts, the witness took into account that defendants were engaged in an unstable or rather unstable and highly specialized business. However, he did not inquire or know whether defendants' business would continue, but assumed that it would. He did not consider or know what, if anything, the shares in the company would sell for on the market, and he knew of no sales with which he could make a comparison. In fixing such value of good will, he did not ascertain or consider what the effect of Mr. Yoder's death would have upon assumed continuation of the partnership business. In that connection he had never had any previous experience with a partnership where one of the partners had died. He once had an experience with a somewhat similar business but it was with a corporation which was admittedly different. He took no account of the expectancy of defendant company's president, Mrs. Munsell, or that operation of the business had to be conducted by someone familiar with the Pure Food and Drug Act and with legislation in states where defendants did business with independent dealers as distinguished from agents, and he did not know or consider that defendants' business had competition and was having a difficult time staying in operation but was losing business at times caused by state statutory regulation and interference by bureaus of health, medical, and pharmaceutical associations. In

that connection, we recently reaffirmed in Gotfrey v. Sakurada, 169 Neb. 879, 101 N. W. 2d 470, that: "The value of the opinion of an expert witness is dependent on, and is no stronger than, the facts on which it is predicated. The opinion has no probative force unless the premises upon which it is based are shown to be true."

On the other hand, there is competent evidence that the company's books and records never had carried good will as an asset; that the partners never considered or treated it as an asset in any purchase of shares or transactions whatever between the parties or otherwise; and that some of Edwin Yoder's shares were purchased at a low price or were actually given to him. Also, there is competent evidence that defendants were engaged in a ticklish, highly speculative, and unstable business which was worthless on the market and had no good will value but that the entire value of Mr. Yoder's interest at the time of his death was $5,497.91. Viewed in such light, the evidence with relation to good will claimed by plaintiff was conflicting to say the least, and we will not disturb the trial court's findings and judgment.

Also, as concluded in Matter of Brown, 242 N. Y. 1, 150 N. E. 581, 44 A. L. R. 510, citing authorities, partners may contract that good will shall not be considered as an asset of the copartnership, and such contract may arise by implication from other contracts and the acts and conduct of the parties, and an inference that there was to be no accounting for good will or dissolution of a partnership may be drawn from the fact that no notice was taken of it as an asset when new members were admitted to the firm or old ones went out.

In that connection, as early as Lobeck v. Lee-Clarke-Andreesen Hardware Co., 37 Neb. 158, 55 N. W. 650, 23 L. R. A. 795, this court held that: "Upon the dissolution of a partnership firm by the death of one of its members, the surviving partners may carry on the same line of business at the same place as was transacted the firm business, without liability to account to the legal

representative of the deceased partner for the good-will of said firm, in the absence of their own agreement to the contrary." See, also, 40 Am. Jur., Partnership, § 307, p. 343.

In the case at bar there is a specific valid contractual provision that in case of the death of any partner, the partnership shall be only technically dissolved and the surviving partners shall continue to operate the business with first option to purchase the deceased partner's interest in the partnership, and said agreement contains no provision that the surviving partners shall be liable to account for good will. Further, as stated in 40 Am. Jur., Partnership, § 270, p. 315, citing authorities: "Of course, in particular instances it may appear that the good will of a firm is without value. Where this is shown to be the case there is no necessity for accounting for it. Furthermore, the partners may contract that the good will of the firm is not to be considered as an asset in winding up its affairs, or that, on the withdrawal of a member, it is to go to the remaining members without any accounting for it. An agreement to this effect, express or implied, will be enforced." Cases relied upon by plaintiff are distinguishable on the facts and the law.

At conclusion of plaintiff's evidence he elected to take the profits of the company from November 6, 1953, through the date the amounts due are paid to plaintiff, in lieu of interest on the alleged capital contribution of Mr. Yoder to the partnership, from November 6, 1953, to the date the amounts due are paid, and plaintiff was given permission to so amend his petition by interlineation. The difficulty with that election and contention is evident from the following: The estate was regularly paid Mr. Yoder's proportionate share of the profits for 1953, 1954, and 1955, and soon after the last payment thereof was made in February 1956, defendants paid Edwin Yoder's capital contribution of $5,497.91 to the estate, whereupon Alta Yoder as executrix accepted

and receipted for all such funds without prejudice, as heretofore stated. Thus Mr. Yoder's capital contribution or interest in the partnership was no longer available thereafter to the surviving partners for the production of either interest or profits, and defendants would not be liable for interest thereon or profits in lieu thereof upon any theory after 1955. On the other hand, plaintiff argued that none of the surviving partners were entitled to any compensation for their services after the death of Mr. Yoder. Therefore, plaintiff would be entitled to larger profits than were paid. We do not agree. The general rule is that: "In the absence of an agreement therefor, or of special circumstances, a surviving partner is not ordinarily entitled to compensation for his services in winding up and settling the partnership affairs." 40 Am. Jur., Partnership, § 313, p. 347. Herein there was an agreement that the business should continue after the death of a partner and there would have been no profits which plaintiff elected to receive unless the surviving partners had continued the business as agreed. A surviving partner is ordinarily entitled to compensation for his services out of profits earned by the deceased partner's capital which he continues to use in the business with consent of the representative of deceased, and even if without consent of the representative of the deceased partner the surviving partner so continues the business at his own risk and makes a profit, the estate is bound to allow reasonable compensation for his services if it elects to share in the gains or profits so made. See 40 Am. Jur., Partnership, § 314, p. 348.

Finally, we conclude that the trial court properly found that the death of Edwin Yoder neither nullified nor destroyed the legal effect of the written partnership agreement of October 1, 1937, with regard to the rights of the partners to "continue to operate the business as trustees upon the same terms and conditions as specified" in the original partnership agreement "except

for the absence of the deceased partner, * * *."

In that connection, section 67-304, R. R. S. 1943, of the Uniform Partnership Act, which became effective August 29, 1943, long after the partnership contract here involved was executed, specifically provides that: "This act shall not be construed so as to impair the obligations of any contract existing when the act goes into effect, nor to effect (affect) any action or proceedings begun or right accrued before this act takes effect."

For reasons heretofore given, we conclude that the judgment of the trial court should be and hereby is affirmed except as modified with respect to taxation of a guardian ad litem fee to plaintiff, which should have been taxed as costs to defendants. All costs in this court are taxed to plaintiff.

AFFIRMED AS MODIFIED.